# United States Court of Appeals

## For the First Circuit

No. 18-1351

LP SOLUTIONS LLC,

Plaintiff, Appellant,

v.

CRAIG J. DUCHOSSOIS, individually and as Co-Executor of the
Estate of Richard Bruce Duchossois; RICHARD L. DUCHOSSOIS;
KIMBERLY T. DUCHOSSOIS; DAYLE P. DUCHOSSOIS-FORTINO; THOMAS A.
SMITH, as Co-Executor of the Estate of Richard Bruce Duchossois,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

---

Before

Lynch, Stahl, and Thompson,
Circuit Judges.

---

Daniel J. Murphy, with whom Bernstein Shur Sawyer & Nelson
was on brief, for appellant.
Nolan L. Reichl, with whom Kyle M. Noonan and Pierce Atwood
LLP were on brief, for appellees.

---

October 24, 2018

---

**LYNCH**, **Circuit Judge**.  This contract case raises the close question of whether the plaintiff has failed to carry its burden of showing that there is personal jurisdiction over the defendants in Maine, as the district court held in a thoughtful opinion dismissing the action.  LP Sols., LLC v. Duchossois, No. 2:18-CV-25-DBH, 2018 WL 1768037, at *1 (D. Me. Apr. 11, 2018).

The underlying dispute involves agreements about the defendants' interests in an Illinois limited partnership, Elm Street Plaza Venture, LLLP.  LP Solutions LLC (LPS), a Maine company, offered to buy limited partnership interests owned by members of the Duchossois family, who are defendants here, and who mostly reside in Illinois.  LPS said that the transaction would provide the family members with payments and tax benefits.  The family members accepted a second offer made to them in Illinois.  Under an agreement with LPS, the family made distribution payments to LPS in Maine only three times, once per year for three years.

In March 2015, the Elm Street partnership's General Partners sued LPS in Illinois.  The thrust of the lawsuit was that LPS could not legally obtain the limited partnership interests from partnership interest holders like the Duchossois family members.  When the family members later refused to deliver partnership distributions made in 2016 that LPS said were assigned to it, LPS sued them in Maine, in a case removed to federal court.

- 2 -

The federal district court, on the undisputed evidence, found there was no personal jurisdiction because the Duchossois family's contacts with Maine did not make the exercise of personal jurisdiction foreseeable.  LP Sols., 2018 WL 1768037, at *1. Although it is a close call, the context of the family's Maine contacts, including their nature, number, origin, and duration, leads us to agree with the district court.  We affirm.

## I.

We take the facts from LPS's properly documented evidentiary proffers and from the Duchossois family's undisputed proffers.  See Copia Commc'ns, LLC v. AMResorts, L.P., 812 F.3d 1, 3 (1st Cir. 2016).

## A.   The Parties

The defendant Duchossois family had partnership interests in Elm Street Plaza Venture, LLLP (a limited liability limited partnership).  The Elm Street LLLP built and owns a residential apartment building in Chicago, Illinois.  That partnership is registered in Illinois, its partnership agreement is governed by Illinois law, its assets are in Illinois, and it is managed by a General Partner who resides in Illinois.  The Duchossois family members, Richard L. Duchossois and his children Craig J. Duchossois, Kimberly T. Duchossois, and Dayle P. Duchossois-Fortino, all live in Illinois, except for Richard Bruce Duchossois who resided in Florida and spent time in South Carolina

- 3 -

before his death in 2014.[1]  Before interacting with LPS, the Duchossois family members collectively owned a 4.54 percent interest in the Elm Street partnership.

LPS is a Portland, Maine-based investor in the affordable housing industry.  It owns "thousands of limited partnership interests and related interests in various limited partnerships across the United States."  Before its dealings with the Duchossois family, LPS already owned a 13.66 percent stake in the Elm Street partnership.

B.   The Contracts

In September 2013, LPS sent letters to the Duchossois family members offering to buy their interests in the Elm Street partnership.  William Gendron, an LPS agent, also called Jennifer Hager, a Duchossois agent in Illinois, to follow up on those letters.  Hager rejected the offer without negotiation.

After that initial rejection, Gendron sent a new offer to Janet Czosek, another Duchossois agent also in Illinois. Gendron represented that the offer -- LPS's "Option Program" -- would have tax benefits for the Duchossois family members.  It would let them "lock [in]" the value of their partnership interests "at today's market value, receive a

---

[1]   Richard Bruce Duchossois's estate has participated in this suit through its co-executors: Craig J. Duchossois and Thomas A. Smith.

significant portion of the purchase price on a tax-deferred basis and avoid tax recapture." LPS marketed its program to individuals whose limited partnership interests had "significant tax recapture." As we understand it, individuals in that circumstance had the choice to either sell their interests in their lifetime, with attendant negative tax consequences, or to "wait until their estate receives the interest" at death. LPS's program gave limited partnership holders a third option: LPS would make an "Option Fee payment[]," which is not taxable "until the final transfer of the limited partnership interest," in return for "partnership cash flow." Simply put, LPS gave the limited partnership holder money up front on a tax-deferred basis in return for a portion of the partnership's distributions.

In September 2013, LPS sent agreements embodying the advertised proposal to each member of the Duchossois family. Those agreements had two main parts: an Option agreement and an Assignment. Both parts were fully drafted and signed by LPS and had the sales price filled in. They both defined LPS as "a Maine limited liability company with a principal place of business" in Portland, Maine.

The Option agreement gave LPS a twenty-year option to purchase the Duchossois family member's partnership interest for a specified amount (the purchase price). There was, apart from the twenty years over which LPS could exercise the option, no term

of years to the agreement. LPS said it would spread payment of the purchase price over a series of payments: First, LPS would pay half the purchase price to the family in Illinois on execution of the agreement. Next, LPS would make payments in two installments, each of about ten percent of the purchase price, in November 2014 and November 2015, respectively. LPS would not, however, pay the balance of the purchase price unless it exercised the option, a choice left to its discretion. If LPS exercised the option before the death of a family member, it would pay to that family member, "as additional sales proceeds, the cost of the tax recapture of the limited partner's negative capital account."

In return, under the Option agreement, if the partnership made a "cash flow distribution," the Duchossois family members would then give LPS part of that distribution, equal to the proportion LPS had paid to that date of the agreement's purchase price. Put more simply, if LPS had paid fifty percent of the purchase price to a particular family member, LPS would be entitled to fifty percent of the partnership's cash flow distributions to that family member. The record contains no evidence that any Duchossois family member had authority to cause the Elm Street LLLP or its General Partners to make or not to make distributions on behalf of the partnership.

The Duchossois family members also agreed not to alienate or encumber their Elm Street partnership interests and to

vote their interests as directed by LPS. They would send "[a]ll notices, demands, and other communications" to LPS in Maine. The agreements do not say where distribution payments to LPS were to be made.

The Assignment required the Duchossois family members to "irrevocably and unconditionally sell[], assign[] and transfer[]" their partnership interests to LPS if LPS exercised its option, as LPS later sought to do. LPS, importantly, "assume[d] all risk" for "any transfer restrictions contained in the Partnership's partnership agreement." The family members assumed no such obligations. (Later, in the lead-up to litigation Elm Street brought against LPS in Illinois, the Elm Street General Partners did object to any such transfer to LPS by any limited partners, including the Duchossois family members.)

The Option agreement states that it is "governed exclusively by the laws of the State of Maine" under a choice-of-law provision. The Assignment, however, is governed by "the laws of the state where the Partnership is domiciled," that is, Illinois. Neither agreement contains a forum-selection clause.

We return to the chronology of events. In September 2013, having received and reviewed LPS's proposal, Hager and Czosek emailed LPS to say that the proposed agreements were acceptable to the family. They did not negotiate price or any other terms with LPS. The two agents collected signatures from the Duchossois

family members in Illinois and South Carolina. In early October 2013, Hager and Czosek sent the executed agreements to LPS in Maine. An LPS employee responded that the agreements lacked witness signatures, so Hager and Czosek sent new, witnessed signature pages to LPS in Maine.

C. Performance, Exercise of Options, and Breach

In October 2013, after the agreements were signed, LPS paid the first installment to the Duchossois family members. LPS sent each payment to Illinois.

The Elm Street partnership made a distribution to the limited partners in June 2014. By then, LPS had paid half of the purchase price to each Duchossois family member, so the family members each sent half of their distribution proceeds to LPS in Maine.

Richard Bruce Duchossois died in July 2014. A Duchossois family agent notified LPS of his death. Hager wrote to "confirm" that Richard Bruce Duchossois's death "[wa]s a triggering event under the agreement" and to inquire about "the next steps." LPS responded requesting information and paperwork necessary to exercise the option. LPS exercised its option on Richard Bruce Duchossois's partnership interest and, in late August, sent the balance of the option price to his estate. The estate executed the Assignment and sent it to LPS in Maine that same month. LPS

did not then exercise its options on the interests of the remaining family members.

In October 2014, LPS made the second round of installment payments to the remaining Duchossois family members.[2] These payments were the second check or wire transfer to each family member that LPS had sent from Maine to Illinois.

The next month, Hager, for the family, emailed Gendron of LPS to say that "[w]e are anxious to speak to you about the tax consequences" of the Option agreements. After the two spoke by phone, Hager followed up to ask whether Gendron "ha[d] an update on the potential to exercise the option agreements for the Duchossois family members before the end of 2014." Gendron testified that he understood this to mean that the family members wanted LPS to exercise its options on each of their interests. There is no evidence as to what the family members understood.

LPS chose to exercise its options on the family members' interests effective in December 2014. LPS's choice required the Duchossois family members to sign the Assignments, so Hager and Gendron spoke by phone in mid-November, and they along with other

---

[2]    The record does not show this second payment being made to Richard L. Duchossois. There is no allegation, however, that LPS did not make this second payment. Later, the record includes uncontradicted testimony that Richard L. Duchossois received all required payments under the Option agreements. Based on this testimony, we assume that LPS made the second payment by wire to Richard L. Duchossois in Illinois.

party agents corresponded back and forth into January 2015. LPS received Richard L. Duchossois's signed Assignment in December and scans of the remaining family members' signed Assignments in January 2015. LPS paid the balance on Richard L. Duchossois's interest by wire transfer in December 2014, and on the remaining family members' interests by checks in February 2015. These were the third round of payments made by LPS to the family members in Illinois.

In January 2015, after the Assignments were executed, LPS communicated by email with the Duchossois family members in Illinois, asking them to each sign and send a letter to the Elm Street partnership's General Partners requesting the General Partners' consent to the Assignments. The family members agreed and sent the letters to the General Partners in Illinois. Two months later, the General Partners responded by letter to Richard L. Duchossois stating that the partnership did not recognize the transfer of his interests to LPS. Craig J. Duchossois received the same letter in his capacity as co-executor of Richard Bruce Duchossois's estate. The General Partners took the same position as to all the remaining family members: the General Partners have not recognized as valid any of the transfers to LPS involving the Duchossois family's ownership interests in the Elm Street partnership.

In March 2015, the Elm Street partnership's manager and General Partners brought suit against LPS in Illinois state court over LPS's efforts to acquire interests in the partnership and other similar partnerships. The Duchossois family made no appearance in and is not a party to that litigation. LPS sought to join the family members as necessary parties, the Elm Street partners opposed, and the Illinois court denied that motion. LPS has made no effort to sue the family in Illinois on the subject matter of this action.

As part of the agreements, LPS had agreed to take on certain tax liability resulting from the sale of the Duchossois family members' partnership interests. The agreements, however, do not say how this was to be accomplished. LPS began this process; it sent a letter to Richard L. Duchossois in Illinois on March 26, 2015, requesting a copy of his 2014 Schedule K-1.[3] The Schedule K-1 is a tax form used to report the filer's share of partnership income. LPS needed copies of that form for each family member so that it could fill out for each a Form 8082, another tax form used to adjust and shift tax liability to the assignee of an economic interest (that is, LPS). LPS included with the letter a FedEx envelope already addressed to return the Schedule K-1 to LPS.

---

[3] Similar requests apparently went to other family members, but the record contains only the letter LPS sent to Richard L. Duchossois.

Two weeks later, Kimberly Spencer, an LPS agent, emailed Hager that she had received 2014 Schedule K-1s from Kimberly and Craig Duchossois and Dayle Duchossois-Fortino. Hager replied that she had sent the forms because "[w]e received a letter from LP Solutions requesting they be sent." Hager then asked when she could expect the "Forms 8082" from LPS in return.

In June 2015 and May and June 2016, the Duchossois family members each sent Elm Street partnership distributions by check to LPS in Maine. The parties engaged in routine correspondence about these payments. These payments when added to the earlier June 2014 payments totaled $86,363.65.

In October 2016, after the Elm Street partnership had sued LPS in Illinois, the partnership experienced what the complaint calls a "capital event." That event was a refinancing of certain of the Elm Street partnership's financial obligations. This resulted in distributions to the limited partners. Again, there is no assertion that the family members controlled or caused this event. LPS has alleged that the distributions collectively totaled over $1,000,000 to the Duchossois family -- about $500,000 to Richard L. Duchossois and $130,000 each to the remaining family members and Richard Bruce Duchossois's estate. LPS's complaint alleges that the family has "refused to remit" these distributions to LPS despite LPS's demands. LPS adds that the family has also retained the nearly $600,000 that LPS paid as consideration for

- 12 -

its option on their interests.   At oral argument in Illinois, counsel for LPS suggested that the Duchossois family had "refus[ed] to move forward" with LPS "because of the confusion that the [Elm Street General Partners] have sewed [sic] as to the validity of the agreement."

D.   Procedural History

LPS sued the Duchossois family in Maine state court on November 15, 2017.  It brought claims for breach of contract, or, in the alternative, for unjust enrichment.  The Duchossois family removed the case to federal court and moved to dismiss for lack of personal jurisdiction.

The district court granted the motion to dismiss, concluding on the prima facie record that exercising specific personal jurisdiction over the Duchossois family would not comport with due process.  LP Sols., 2018 WL 1768037, at *1.  The district court found that the Duchossois family members "did not purposefully avail themselves of the privilege of conducting activities in Maine in a way that would make jurisdiction over them here foreseeable."  Id. at *11.[4]

LPS timely appealed.

---

[4]     The district court also denied LPS's request for jurisdictional discovery.  LPS has not appealed that denial.

- 13 -

II.

A.  Standard of Review

Given the district court's use of prima facie review, we take the plaintiff's evidentiary proffers as true and we consider uncontradicted facts proffered by the defendant.  C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 65 (1st Cir. 2014).  It is LPS's burden to proffer evidence "sufficient to support findings of all facts essential to personal jurisdiction," and to do so without relying on unsupported allegations.  A Corp. v. All Am. Plumbing, Inc., 812 F.3d 54, 58 (1st Cir. 2016).  Our review is de novo.  See Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 147 (1st Cir. 1995).

B.  Personal Jurisdiction

In diversity jurisdiction cases like this one, the exercise of personal jurisdiction must be both authorized by state statute and permitted by the Constitution.  Harlow v. Children's Hosp., 432 F.3d 50, 57 (1st Cir. 2005).  The state statute here, Maine's long-arm statute, reaches "to the fullest extent permitted by the due process clause of the United States Constitution."  Me. Rev. Stat. Ann. tit. 14, § 704-A(1) (2016).  The parties agree that our inquiry resolves into only whether the exercise of jurisdiction complies with due process.

For the exercise of jurisdiction to be constitutional, a defendant must have "certain minimum contacts with [the forum

- 14 -

state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).[5] LPS has asserted specific personal jurisdiction over the Duchossois family, so the constitutional analysis here has three components: relatedness, purposeful availment, and reasonableness. Plixer Int'l, Inc. v. Scrutinizer GmbH, No. 18-1195, 2018 WL 4357137, at *3 (1st Cir. Sept. 13, 2018). That is, LPS must show that (1) its claim directly arises out of or relates to the defendant's forum activities; (2) the defendant's forum contacts represent a purposeful availment of the privilege of conducting activities in that forum, thus invoking the benefits and protections of the forum's laws and rendering the defendant's involuntary presence in the forum's courts foreseeable; and (3) the exercise of jurisdiction is reasonable. Id.

LPS must make all three showings to establish specific personal jurisdiction. See C.W. Downer, 771 F.3d at 65. We hold that LPS has not made the second showing because, on the evidence

---

[5] The Duchossois family's Maine contacts mostly came from their agents, but "[f]or purposes of personal jurisdiction, the actions of an agent may be attributed to the principal." Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 55 (1st Cir. 2002). In our analysis, we treat each of the Duchossois family members "as identically situated for ease of exposition." Copia Commc'ns, 812 F.3d at 5 n.3.

LPS has presented, we find, in agreement with the district court, that the Duchossois family has not purposefully availed itself of the privilege of conducting activities in Maine, thus invoking the Maine forum's laws and rendering the family's presence in the forum's courts foreseeable.

## 1. Relatedness

The district court found that LPS had made a sufficient showing under the relatedness prong, save that the contacts involving LPS's preparation of tax forms for the Duchossois family were not related. LP Sols., 2018 WL 1768037, at *7. To show relatedness, LPS must produce evidence that shows its "cause of action either arises directly out of, or is related to, the defendant's forum-based contacts." Harlow, 432 F.3d at 61 (citing United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1088-89 (1st Cir. 1992).[6] Even if LPS has

---

[6] Both of LPS's claims -- for breach of contract and unjust enrichment -- would be reviewed under the same contract-based relatedness test. See C.W. Downer, 771 F.3d at 64, 66 (applying the same jurisdictional analysis to related breach of contract and unjust enrichment claims). The parties dispute the content of that contract-based test. The Duchossois family says that the only contacts that count are those that are "instrumental either in the formation of the contract or its breach." Adelson v. Hananel, 510 F.3d 43, 49 (1st Cir. 2007) (quoting Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 289 (1st Cir. 1999)). LPS responds that relatedness is a "flexible, relaxed standard" that requires us to "focus on the parties' prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." C.W. Downer, 771 F.3d at 66 (quotation marks omitted). The dispute is beside the point here as we agree with the district court that

- 16 -

satisfied the relatedness prong to the extent found by the district court, it has not satisfied the purposeful availment prong, so we turn to the purposeful availment analysis. See, e.g., Adams v. Adams, 601 F.3d 1, 6 (1st Cir. 2010) (assuming, arguendo, that the plaintiff had satisfied the relatedness prong before concluding that the plaintiff had not made a showing of purposeful availment).

## 2. Purposeful Availment

LPS must show that the Duchossois family has purposefully availed "itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958) (citation omitted). The test for purposeful availment "is only satisfied when the defendant purposefully and voluntarily directs his activities toward the forum so that he should expect, by virtue of the benefit he receives, to be subject to the court's jurisdiction based on these contacts." United States v. Swiss Am. Bank, 274 F.3d 610, 624 (1st Cir. 2001). This standard ensures that the exercise of jurisdiction is essentially voluntary and foreseeable, C.W. Downer, 771 F.3d at 66, not based on a defendant's "random, fortuitous, or attenuated [forum] contacts," Carreras v. PMG Collins, LLC, 660 F.3d 549, 555 (1st Cir. 2011) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)).

_____

LPS has not carried its burden of proving that the Duchossois family purposefully availed itself of Maine.

The parties agree that there is no issue as to voluntariness here. The question is thus whether the Duchossois family's Maine contacts are "of a nature that the [family] could 'reasonably anticipate being haled into court [in Maine].'" Phillips v. Prairie Eye Ctr., 530 F.3d 22, 28 (1st Cir. 2008) (quoting Adelson v. Hananel, 510 F.3d 43, 50 (1st Cir. 2007)). We agree with the district court that, on the evidence LPS has presented, the Duchossois family's Maine contacts did not make the exercise of jurisdiction reasonably foreseeable. LP Sols., 2018 WL 1768037, at *8.

In contract cases, we have found that the exercise of jurisdiction is reasonably foreseeable when "the defendant deliberately direct[ed] its efforts toward the forum state," C.W. Downer, 771 F.3d at 68 (citing Burger King, 471 U.S. at 476), or when the defendant "enter[ed] a contractual relationship that envisioned continuing and wide-reaching contacts in the forum State," id. (quoting Walden v. Fiore, 571 U.S. 277, 285 (2014)). The Duchossois family has neither directed its efforts toward Maine nor entered into such an extensive contractual relationship.

First, the origin of the parties' contractual relationship factors against a finding of purposeful availment. The Duchossois family did not reach out to Maine looking to sell its interests in the Elm Street partnership; instead, LPS reached out to the family in Illinois to solicit the sale. Of course, a

- 18 -

lack of solicitation alone is not necessarily determinative, see Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 38 (1st Cir. 2016), but the lack of an effort by the Duchossois family to reach out to Maine distinguishes this case from several in which we have found the test for purposeful availment met. Compare Cossart v. United Excel Corp., 804 F.3d 13, 21 (1st Cir. 2015) (noting, in support of purposeful availment, that the defendant "recruited" for employment the plaintiff at his home in the forum), and Adelson v. Hananel, 652 F.3d 75, 82–83 (1st Cir. 2011) (concluding that the defendant had purposefully availed himself of the forum in part because he "sought" the employment contract at issue "with a company whose key officers were all located in [the forum]"), with Prairie Eye Ctr., 530 F.3d at 29 (emphasizing the lack of solicitation when finding no purposeful availment).

And second, the parties' contractual relationship does not render the exercise of jurisdiction foreseeable. The Duchossois family did knowingly enter into a contractual relationship with a Maine entity, but, as the district court properly noted, see LP Sols., 2018 WL 1768037, at *8, "the defendant's awareness of the location of the plaintiff is not, on its own, enough to create personal jurisdiction over a defendant." Prairie Eye Ctr., 530 F.3d at 28. Something more is needed: the contractual relationship must either envision or include

- 19 -

sufficient continuous and wide-ranging contacts with Maine to meet the foreseeability test.

LPS argues that its agreements with the Duchossois family envisioned continuous and wide-ranging contacts with Maine. That argument is misleading. The family had no independent obligations under the agreements with LPS; each of the family's obligations depended first on the action of someone outside the family. If the General Partners brought up some matter needing a vote of the limited partnership interest, the family had to consult with LPS before voting. If the General Partners made a distribution, the family had to forward part of it to LPS. And if LPS elected to exercise its option, the family members had to execute their respective Assignments. But the agreements nowhere required the General Partners to make a distribution or to bring a matter to a vote. Nor did the agreements require LPS to exercise its options. And, again, there is no allegation in the record that the Duchossois family exercised control over either the General Partners or the distributions made by the partnership.

The Duchossois family's contractual obligations are different from those that courts have found justify the exercise of jurisdiction. The contingent nature of the family's contractual obligations separate this from a franchise contract case like Burger King, in which the defendant voluntarily accepted "the long-term and exacting regulation of his business from" the plaintiff

in the forum. 471 U.S. at 480. And these contingent obligations separate this case from a services contract case like C.W. Downer, which involved an agreement under which the plaintiff "acted as [the defendant's] exclusive financial adviser in connection with" the defendant's potential sale, and which thus required "interactive communications between the two [parties] for an extended period of time." 771 F.3d at 63, 68. The family's contingent contractual obligations here mean that their Maine contacts were also contingent, which undercuts the case for foreseeability. Cf. Scottsdale Capital Advisors Corp. v. The Deal, LLC, 887 F.3d 17, 21 (1st Cir. 2018) (noting, in a defamation case, that the plaintiffs' argument was based on assumptions untethered to evidence, which left "a hole in [their] prima facie case for maintaining jurisdiction").

Next, LPS emphasizes its own obligations under the agreement and the twenty-year term over which it could exercise its option, provided that the Option agreement was not terminated earlier. This was not, however, a contract requiring performance of continuing obligations over a twenty-year period. Far from it. Even if LPS kept the option for the full twenty years, the agreement only required LPS to make three payments: one at signing, one a year later, and one a year after that. And LPS had to prepare tax forms only once: on exercise of the option. These tax forms were meant to assign the "income (loss) attributable to the

economic interest from [the family] to [LPS]." The tax forms were necessary for LPS to get the full benefit of its deal with the family, so their preparation does little to show that the Duchossois family purposefully availed itself of Maine. Cf. Copia Commc'ns, 812 F.3d at 5-6 (noting that forum contacts that "represent[] a convenience for [the plaintiff]" do not show "the type of availment by [the defendant]" that would justify the exercise of jurisdiction).

Given the few contractual commitments tying the Duchossois family members to Maine, the family members' actual contact with Maine strikes us as more relevant to the purposeful availment inquiry. And that actual contact was limited. The Duchossois family merely sent the amount of three partnership distributions into Maine, sent the executed Assignments into Maine, collaborated with LPS on tax issues, and corresponded about these.

The Duchossois family's payments to Maine do not support the exercise of jurisdiction. In Baskin-Robbins we concluded that the exercise of jurisdiction was foreseeable in part because the defendant had sent "a constant stream of payments" into the forum. 825 F.3d at 38-39. That stream comprised 180 payments made monthly over about fourteen years. See id. at 39. In contrast, the Duchossois family sent only three partnership distributions, one per year over three years, to LPS in Maine. As the district court

correctly noted, see LP Sols., 2018 WL 1768037, at *9, the sending of such "occasional payments into the forum state" here lacks "'decretory significance'" in the jurisdictional calculus. Baskin-Robbins, 825 F.3d at 38 (quoting Phillips Exeter Acad. v. Howard Phillips Fund, Inc., 196 F.3d 284, 291 (1st Cir. 1999)).

Nor do the Maine activities and communications by the family members support the exercise of jurisdiction. We upheld the exercise of jurisdiction in Baskin-Robbins in part because the defendant caused the plaintiff to undertake "a plethora of activities on its behalf" in the forum. Id. at 39. Those activities, like product testing and the processing of customer complaints, better enabled the defendant to exploit the forum market. See id. at 38. In contrast, LPS took on few activities in Maine, like the preparation of tax forms and payments, for the Duchossois family. These few activities are better evidence of LPS's intent to exploit the Illinois market than the Duchossois family's intent to exploit the Maine one. In the district court's words, "[a]bsent are the substantial, ongoing, interdependent controls and commitments that are typical of franchise and services contract cases and often justify jurisdiction."[7] LP Sols., 2018 WL 1768037, at *10.

---

[7] That the Option agreements required the Duchossois family members to vote their partnership interests at LPS's direction does not change this analysis. We have typically considered whether a contract subjects a defendant to "substantial

- 23 -

Relatedly, communication between representatives of LPS and the Duchossois family was sporadic. Months went by without a single email or phone call. And when the parties did correspond, most of the communications from the Duchossois family to LPS were responsive, having been instigated by LPS. In contrast, the Baskin-Robbins parties coordinated "on a wide variety of operational issues," with "communications occurr[ing] regularly (at a minimum, monthly)." 825 F.3d at 39.

We reject LPS's three remaining arguments. LPS first argues that several times the Duchossois family reached out to LPS, and that this shows that the family has purposefully availed itself of Maine. The first instance was when Richard Bruce Duchossois died. Hager, an agent for the family, sought only to "confirm" that his death was a "triggering event under the agreement." After LPS exercised its option on Richard Bruce Duchossois's partnership interest, Hager inquired "about the tax consequences for the Duchossois family members" and followed up to ask for "an update on the potential to exercise the option agreements" for the remaining family members. These communications do not show that the family purposefully availed itself of Maine. Instead, as the district court noted, these

control" under the rubric of relatedness. See, e.g., Prairie Eye Ctr., 530 F.3d at 27. For present purposes, we merely note that there is no record evidence of LPS exercising any control over the Duchossois family under this contractual provision.

communications were "merely an extension of the parties' preexisting relationship that had been initiated by [LPS]." LP Sols., 2018 WL 1768037, at *9. The Duchossois family "did not intentionally avail themselves of the benefits of doing business in [Maine] merely by calling residents of [Maine] to request" payments that LPS had already agreed to make. Carreras, 660 F.3d at 556.

Second, LPS argues that there were negotiations between the parties that support the exercise of jurisdiction. But the record contains no evidence of any such negotiations. It shows only that the Duchossois family rejected LPS's first offer, and merely signed the draft agreements for the second offer that LPS provided to them outside Maine. There was no give-and-take over language, price, or any other contractual terms, much less extensive back-and-forth discussions. While on prima facie review we must "construe [the plaintiff's evidentiary proffers] in the light most favorable to the plaintiff's claim," C.W. Downer, 771 F.3d at 65, LPS cannot rely on unsupported allegations to establish jurisdiction, see A Corp., 812 F.3d at 58.

And third, LPS suggests that the fact that the Option agreements are governed by Maine law is a relevant Maine contact. The Option agreements have a Maine choice-of-law provision, but the Assignments are governed by Illinois law. The district court considered these competing provisions at best "a wash." LP Sols.,

2018 WL 1768037, at *9. We think the Assignments' provision is more pertinent. That provision's selection of Illinois law highlights the fact that the underlying interests here are in Illinois, a factor that counts against jurisdiction. Cf. Pritzker v. Yari, 42 F.3d 53, 62 (1st Cir. 1994) (upholding the exercise of jurisdiction when the defendant "knowingly acquir[ed] an economically beneficial interest in the outcome of a [forum-based] lawsuit that involved control over property located in [the forum]").

Finally, the Duchossois family emphasizes that neither its members nor agents set foot in Maine on business with LPS. That is hardly dispositive, C.W. Downer, 771 F.3d at 68, but is relevant to the jurisdictional analysis, see Baskin-Robbins, 825 F.3d at 38. The lack of such contact here tends to confirm that the family could not foresee the exercise of jurisdiction.

*     *     *

The Duchossois family's Maine contacts, on this record, do not constitute the "continuing and wide-reaching contacts," Burger King, 471 U.S. at 480, that form the "substantial connection," C.W. Downer, 771 F.3d at 68 (quotation marks omitted), with the forum necessary to make the exercise of jurisdiction foreseeable. As the district court noted, this case's "center of gravity is in Illinois: it concerns in part the alienability of Illinois limited partnership interests in Illinois real estate

- 26 -

governed by Illinois law, issues which have been raised in a pending Illinois lawsuit." LP Sols., 2018 WL 1768037, at *12. This Illinois focus makes Maine litigation less foreseeable to the family, which dooms LPS's case for purposeful availment.

There is no argument that the district court used the wrong legal framework, and, on this record, we find no error in its conclusion that the exercise of jurisdiction over the Duchossois family would not comport with due process.[8]

III.

The district court's judgment is affirmed.

---

[8] Because LPS has not presented sufficient evidence of minimum contacts, we need not address the Duchossois family's claim that it should prevail under the reasonableness prong. See Pleasant St., 960 F.2d at 1091 n.11.