# United States Court of Appeals
## For the First Circuit

Nos. 18-1550
     18-1551

STEPHEN D. KNOX; JEAN KNOX,

Plaintiffs, Appellants,

v.

METALFORMING, INC.,

Defendant, Appellant,

SCHECHTL MASCHINENBAU GMBH,

Defendant, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lynch, Stahl, and Barron,
Circuit Judges.

Benjamin R. Zimmermann, with whom Stacey L. Pietrowicz and Sugarman and Sugarman, P.C. were on brief, for Stephen and Jean Knox.

Javier F. Flores, with whom Eric V. Skelly, Thaddeus M. Lenkiewicz, and Manning Gross & Massenburg LLP, were on brief, for MetalForming, Inc.

Frederick W. Reif, with whom Marie E. Chafe, Cornell & Gollub, Debra Tama, and Wilson Elser Moskowitz Edelman & Dicker, LLP, were on brief, for Schechtl Maschinenbau GmbH.

January 30, 2019

**LYNCH**, **Circuit Judge**.  Stephen Knox's hand was badly injured at his work at Cape Cod Copper (CCC) in October 2016 when he operated a machine that was manufactured by defendant Schechtl Maschinenbau GmbH, a German company.  The machine had been sold to CCC by defendant MetalForming, Inc., an American company located in Georgia and Schechtl's U.S. distributor.

The question on appeal is whether there is personal jurisdiction over Schechtl, named as a defendant by Knox and as a cross-claim defendant by MetalForming.  The district court dismissed the claims against Schechtl, finding that Schechtl had not purposefully availed itself of the privilege of doing business in Massachusetts.  Knox v. MetalForming, Inc., 303 F. Supp. 3d 179, 184 (D. Mass. 2018).

We reverse.

I.

A.  Background

The district court did not permit jurisdictional discovery.  Id. at 187.  The following facts are undisputed.

In October 2016, Stephen D. Knox, plaintiff here along with his wife, Jean, was injured while using a Schechtl MAX 310,[1] a motor-driven metal-bending machine.  The injury occurred at CCC,

---

[1]    Although some materials refer to the machine as a "MAX3100 FOLDER," the parties refer to it as a "MAX 310," and we will do the same.

Knox's place of employment, located in Lakeville, Massachusetts. When Knox inadvertently hit the foot pedal of CCC's MAX 310, the machine activated, crushing his left hand.

Schechtl, the manufacturer of the MAX 310, is headquartered in Edling, Germany and maintains no operations in the United States. The company's marketing materials say that Schechtl manufactures the "most popular architectural sheet metal folders in the world."

Schechtl sells its machines to United States customers through MetalForming, a separate and independently owned U.S. distribution company. Schechtl's distribution agreement ("the agreement") with MetalForming gives MetalForming the exclusive right to distribute Schechtl's products in the "Contract Territory," which comprises Canada, the United States, and Mexico.

The agreement outlines the procedure for selling Schechtl's machinery. The purchasing end user ("the purchaser") places an order with MetalForming, which in turn acquires the machine from Schechtl. MetalForming then sends a purchase order, naming the purchaser, to Schechtl in Germany. Under the agreement, MetalForming must include "technical and other data" in the purchase order, because that information is "of importance for the ordered product, the supply contract, and its performance."

Schechtl then chooses whether to accept the purchase order. If it does accept, it issues a written order confirmation,

which "govern[s] the product to be delivered, its technical qualities, the delivery price, the place of delivery, the time of delivery as well as all other relevant contractual provisions."

Schechtl then manufactures the machine to the purchaser's specifications.  The agreement provides that Schechtl "reserves the right, in the exercise of its sole discretion, to discontinue the manufacture or distribution of any Product without incurring any obligation to [MetalForming]."

When the machine is ready, Schechtl delivers it to a "freight forwarder or other transport agency" in Germany, at which point ownership passes to MetalForming.  The record does not detail the ordinary shipment process after that point, but, as we describe below, it does show how the MAX 310 that injured Knox came to CCC.

Under the agreement, MetalForming is responsible for installation at the purchaser's site and for training the purchaser's personnel in the proper use of the machine.  The agreement does, however, provide that it may "become necessary that installation work be conducted under the direction of a" Schechtl technician.  And there is somewhat different information as to training contained in the information manual, as noted below.

The agreement also requires that MetalForming "provide any and all warranty services for the" Schechtl products.  Schechtl provides a one-year warranty "to the end users for all of its machines, machine parts, tools, spare parts, and accessories."

MetalForming must also, under the agreement, "pass along to customers information received from [Schechtl]" regarding the products and their proper use. This information is packaged in with each machine when it is delivered to the purchaser. The enclosed material includes a declaration that the machine had been "developed, designed and manufactured in compliance with" applicable European safety directives. It also includes instruction manuals and safety instructions for each machine.

The instruction manual includes an "Instruction for Inquiries and Spare Part Orders," which directs purchasers to contact Schechtl (and not MetalForming) for inquiries and for additional machine parts. A later troubleshooting section of that manual also instructs that operators experiencing a problem should, "[i]f it is not possible to correct the malfunction with the aid of the following tables, contact the Schechtl Maschinenbau GmbH Service department." It does not instruct the operator/purchaser to contact MetalForming. The manual also offers that "[t]he operating company may receive extensive machine training by Schechtl Maschinenbau GmbH upon request . . . at [Schechtl's] facilities or at the operating company's facilities." There is no evidence as to whether any Massachusetts purchaser made such a request.

The materials provided to the purchasers of Schechtl machines contain Schechtl's direct contact information, including

its phone and fax numbers and its mail and email addresses. Schechtl also operates a website that instructs purchasers of its machines to contact Schechtl directly for frequently asked questions, sales, parts, and other information relating to its machines. See Schechtl, http://www.schechtl.biz/index_e.htm (last visited Jan. 24, 2019).

Schechtl has provided MetalForming with advertising materials to market Schechtl products in the United States. MetalForming has promoted Schechtl machines in national trade publications and at industry trade shows. There is no record evidence as to the Massachusetts recipients of those trade publications. And while the record shows that Schechtl representatives attended several trade shows in the United States with MetalForming, there is no evidence that any of those shows were in Massachusetts.

Between 2000 and September 2017, MetalForming sold 2,639 Schechtl sheet metal machines throughout the United States, at a value of just over $97 million. Between July 2001 and September 2017, MetalForming sold to purchasers in Massachusetts forty-five Schechtl machines and 234 Schechtl parts, at a value of nearly $1.5 million (about $1.3 million for the machines and $176,752 for the parts). Schechtl's Massachusetts machine sales appear to constitute 1.35% of its United States machine sales. The record does not reveal Schechtl's total parts sales in the U.S.

Schechtl sold the MAX 310 which injured Knox to MetalForming in April 2001. MetalForming took delivery in Georgia. In August, four months after the initial sale, MetalForming shipped the machine to CCC, with CCC taking ownership of the machine in Georgia. The respective purchase orders show that MetalForming purchased the machine from Schechtl for $25,830 and sold it to CCC for $38,950. The purchase order from MetalForming to Schechtl identified the purchaser as CCC but did not give CCC's location. The purchase order from MetalForming to CCC shows that the machine came with a one-year Schechtl warranty and that the price included a "Schechtl Installation Charge" and a "Schechtl Freight Charge" to the purchaser, but no party explains what these last two terms mean or who receives the payment.

B. Procedural History

The Knoxes sued both Schechtl and MetalForming in Massachusetts state court. They alleged negligence, breach of warranty, loss of consortium, and violation of the Massachusetts consumer protection statute, Mass. Gen. Laws ch. 93A. MetalForming removed the case to Massachusetts federal district court and filed crossclaims against Schechtl for indemnification, contribution, and breach of contract. Schechtl moved to dismiss the claims against it for lack of personal jurisdiction. Both the Knoxes and MetalForming opposed Schechtl's motion.

The district court, after finding that the terms of Massachusetts's long-arm statute were "easily . . . satisfied," Knox, 303 F. Supp. 3d at 183, nonetheless granted Schechtl's motion to dismiss, id. at 188. The court reasoned that, even though "Schechtl ha[d] derived . . . 'substantial revenue' from MetalForming's sales of Schechtl equipment to Massachusetts customers," id. at 186, Schechtl had not purposefully availed itself of the privilege of doing business in Massachusetts, id. at 187. The court added that there was "[n]o Massachusetts-specific 'plus' factor," like "'special state-related design, advertising, advice, marketing,' etc." Id. at 186 (quoting J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 889 (2011) (Breyer, J., concurring)). The court did not mention either the instructions or the warranties that Schechtl provided to the purchasers in Massachusetts.

This appeal followed.

## II.

The district court held that MetalForming had not made a prima facie showing of personal jurisdiction. See id. at 184. On prima facie review, the plaintiffs' burden is to proffer evidence "sufficient to support findings of all facts essential to personal jurisdiction" without relying on unsupported allegations. A Corp. v. All Am. Plumbing, Inc., 812 F.3d 54, 58 (1st Cir. 2016). We construe these facts "in the light most congenial to the

plaintiff's jurisdictional claim."  Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998).  "Our review is de novo."  LP Sols. LLC v. Duchossois, 907 F.3d 95, 102 (1st Cir. 2018).

In a diversity jurisdiction case like this one, "a plaintiff must satisfy both the forum state's long-arm statute and the Due Process Clause of the Fourteenth Amendment."  C.W. Downer & Co. v. Bioriginal Food & Sci. Corp., 771 F.3d 59, 65 (1st Cir. 2014).  Compliance with the terms of the Massachusetts long-arm statute is not contested here.  Schechtl proceeds directly to the federal constitutional analysis; we will do so as well.

For the exercise of personal jurisdiction to be constitutional, a defendant must have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).  The constitutional "inquiry is highly 'fact-specific.'"  PREP Tours, Inc. v. Am. Youth Soccer Org., No. 17-1223, 2019 WL 126221, at *4 (1st Cir. Jan. 8, 2019) (quoting United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1089 (1st Cir. 1992)).  Importantly, the "test is 'not susceptible of mechanical application; rather, the facts of each case must be

weighed.'"  Id. (quoting Kulko v. Superior Ct. of Cal., 436 U.S. 84, 92 (1978)).

The Knoxes and MetalForming have asserted specific personal jurisdiction over Schechtl, so the constitutional analysis here has three components: relatedness, purposeful availment, and reasonableness.  Plixer Int'l, Inc. v. Scrutinizer GmbH, 905 F.3d 1, 7 (1st Cir. 2018).  That is, the plaintiffs must show that (1) their claims directly arise out of or relate to the defendant's forum activities; (2) the defendant's forum contacts represent a purposeful availment of the privilege of conducting activities in that forum, thus invoking the benefits and protections of the forum's laws and rendering the defendant's involuntary presence in the forum's courts foreseeable; and (3) the exercise of jurisdiction is reasonable.  Id.  The Knoxes and MetalForming must meet all three requirements to establish personal jurisdiction.  Id.  We hold that they have.

The district court reached only the issue of purposeful availment.  But at oral argument Schechtl's counsel conceded that the other two requirements are met.  We briefly explain below why we agree and address the main issue of purposeful availment.

A.   Relatedness

To show relatedness, the Knoxes and MetalForming must demonstrate that their "cause of action either arises directly out of, or is related to, the defendant's forum-based contacts."

Harlow v. Children's Hosp., 432 F.3d 50, 61 (1st Cir. 2005) (citing 163 Pleasant St., 960 F.2d at 1088-89). This "flexible, relaxed standard," N. Laminate Sales, Inc. v. Davis, 403 F.3d 14, 25 (1st Cir. 2005) (quoting Pritzker v. Yari, 42 F.3d 53, 61 (1st Cir. 1994)), requires only that the claim have a "demonstrable nexus" to the defendant's forum contacts, Mass. Sch. of Law, 142 F.3d at 34. This requirement is easily met here.

B.  Purposeful Availment

The case turns on the purposeful availment prong. To meet this requirement, the Knoxes and MetalForming bear the burden of demonstrating that Schechtl has "purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958).

The purposeful availment requirement ensures that the exercise of jurisdiction is essentially voluntary and foreseeable, C.W. Downer, 771 F.3d at 66, and is not premised on a defendant's "random, fortuitous, or attenuated contacts," Carreras v. PMG Collins, LLC, 660 F.3d 549, 555 (1st Cir. 2011) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985)). "[T]he Supreme Court has explained that 'the foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" PREP Tours, 2019 WL

126221, at \*6 (quoting Burger King, 471 U.S. at 474). This requirement applies equally to foreign defendants. Plixer, 905 F.3d at 7.

Each side asserts that the Supreme Court's decision in J. McIntyre Machinery, Limited v. Nicastro supports its view. Like other circuits, we have held that the narrowest, and thus binding, opinion from the "fragmented Court" in that case was Justice Breyer's. Plixer, 905 F.3d at 10 (quoting Marks v. United States, 430 U.S. 188, 193 (1977)); accord Williams v. Romarm, SA, 756 F.3d 777, 784 (D.C. Cir. 2014) (finding Justice Breyer's concurring opinion controlling under Marks); Ainsworth v. Moffett Eng'g, Ltd., 716 F.3d 174, 178 & n.14 (5th Cir. 2013) (same); AFTG-TG, LLC v. Nuvoton Tech. Corp., 689 F.3d 1358, 1363 (Fed. Cir. 2012) (same). In the end we do not think that this case, on the facts here, fails the personal jurisdiction tests articulated by either Justice Breyer's concurring opinion or the plurality opinion in Nicastro.

The district court found that Schechtl had not designated Massachusetts "for special attention" and had not "target[ed] buyers within" Massachusetts. Knox, 303 F. Supp. 3d at 186. Using those tests, the district court held that Schechtl had not purposefully availed itself of the privilege of conducting

business in the Commonwealth.  Id.[2]  Those, as our Plixer decision later made explicit, are not the exclusive tests to establish purposeful availment.

In Plixer we concluded that "Supreme Court precedent does not establish specific targeting of a forum as the only means of showing that the purposeful availment test has been met."  905 F.3d at 9 (emphasis added).  Depending on the facts, a defendant's "'regular flow or regular course of sale' in the [forum]" could make the exercise of jurisdiction foreseeable to the defendant.  Id. at 10.  And, again depending on the facts, jurisdiction could be foreseeable based on "something more" than this, evidencing an intent to serve the forum.  Id. (citing Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal., 480 U.S. 102, 111-12 (1987) (opinion of O'Connor, J.)).  Justice O'Connor's plurality opinion in Asahi, endorsed by the plurality opinion in Nicastro, see 564 U.S. at 885 (plurality opinion), says that "something more" may include, "for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve

---

[2]    To be clear, there is no argument that a producer like Schechtl is subject to jurisdiction solely because it knows that its products might be sold in Massachusetts.  See Nicastro, 564 U.S. at 891 (Breyer, J., concurring) (rejecting such a standard).

as the sales agent in the forum State."  <u>Asahi</u>, 480 U.S. at 112 (opinion of O'Connor, J.).

Specific jurisdiction must rest on a defendant's voluntary contact with the forum and not on "the 'unilateral activity of another party or a third person.'"  <u>Burger King</u>, 471 U.S. at 475 (quoting <u>Helicopteros Nacionales de Colombia, S.A.</u> v. <u>Hall</u>, 466 U.S. 408, 417 (1984)).  The argument for jurisdiction here does not rest on MetalForming's Massachusetts activities.  It rests instead on the totality of Schechtl's activities, voluntarily undertaken, that connect the German company to Massachusetts.

These voluntary acts on Schechtl's part led to a "regular flow or regular course of sales," and more than that, in the Commonwealth.  Over sixteen years, Schechtl, through MetalForming, sold forty-five machines (an average of close to three machines in each of those sixteen years).  It also provided 234 parts to purchasers in Massachusetts.  Those parts and machines led to nearly $1.5 million of Massachusetts sales for Schechtl.

We compare this case to <u>Plixer</u>, in which we upheld the exercise of jurisdiction over a defendant who, over three-and-a-half years, served 156 forum customers, generating about $200,000 in business.  <u>See</u> 905 F.3d at 4-5; <u>see also</u> <u>id.</u> at 11 (describing post-<u>Nicastro</u> rulings upholding the exercise of jurisdiction based on "a regular course of sales").  And we compare Schechtl to the

defendant in Nicastro, who Justice Breyer described as having made "a single isolated sale" into the forum. 564 U.S. at 888 (Breyer, J., concurring). Schechtl certainly does not fall into the category of manufacturer, "small" in "shape[] and size[]," described by Justice Breyer in Nicastro. Id. at 892 (Breyer, J., concurring).

Schechtl argues that we should discount its Massachusetts sales because those sales were part of a nationwide sales effort. But the question is not whether a defendant sells its product across the U.S.; it is instead whether a defendant's forum connection is such "that the exercise of jurisdiction is essentially voluntary and foreseeable." Plixer, 905 F.3d at 7 (citing C.W. Downer, 771 F.3d at 66); see Ainsworth, 716 F.3d at 179 (upholding the exercise of jurisdiction based on substantial in-forum sales, even though the defendant's forum sales represented only 1.55% of its nationwide sales during the relevant period). And we note that the use of a nationwide distributor does not automatically preclude the exercise of jurisdiction. See Ainsworth, 716 F.3d at 179 (upholding the exercise of jurisdiction over a manufacturer even though the manufacturer employed a nationwide distributor).

To be clear, we do not hold that the mere volume of Schechtl's sales in Massachusetts over sixteen years standing

alone would suffice (a hypothetical situation we need not address). There is more here.

Schechtl individually approved and manufactured according to purchaser-provided specifications each of the nearly fifty machines it sent to Massachusetts purchasers. See In re Chinese-Manufactured Drywall Prods. Liab. Litig., 742 F.3d 576, 589 (5th Cir. 2014) (upholding the exercise of personal jurisdiction based in part on the defendant's fulfilling product orders on a "made-to-order basis"); cf. Asahi, 480 U.S. at 112 (opinion of O'Connor, J.) (adding that "designing the product for the market in the forum State" may be "additional conduct" necessary to make the exercise of jurisdiction constitutional).

Schechtl's relationship with purchasers in Massachusetts did not end when Schechtl accepted the purchase order and manufactured the machine. Schechtl required that MetalForming include, with each machine, materials that instructed that purchaser to contact Schechtl directly, whether to purchase replacement parts or to obtain assistance with troubleshooting and fixing problems. From the fact that hundreds of Schechtl parts were delivered to Massachusetts, the inference is entirely plausible that Massachusetts purchasers did use the channels Schechtl established both as to spare parts and as to troubleshooting.

Schechtl's channels to Massachusetts purchasers constitute efforts to continue -- and perhaps to expand -- its relationship with Massachusetts purchasers. Those deliberately opened channels, kept open over many years and presumably used, are relevant to the jurisdictional analysis. See Asahi, 480 U.S. at 112 (opinion of O'Connor, J.) (noting that "establishing channels for providing regular advice to customers in the forum State" may be "something more" in support of jurisdiction). Those channels established a direct link between Schechtl and its purchasers. Here that means that Schechtl voluntarily opened at least forty-five such direct links with Massachusetts purchasers. Schechtl's long service of purchasers in Massachusetts through at least its spare parts sales bolsters our conclusion that the exercise of jurisdiction here is foreseeable.[3]

Purposeful availment analysis "'will vary with the quality and the nature of the defendant's activity.'" PREP Tours, 2019 WL 126221, at *6 (quoting Burger King, 471 U.S. at 474-75). This case involves a manufacturer which can direct where its products go, which sold dozens of expensive products into the forum

---

[3] Schechtl argues that it did not know that CCC was located in Massachusetts. Even if that contention were correct, we would not consider it dispositive given all the other facts here. We do not comment on MetalForming's argument that Schechtl should have known CCC's location.

We also do not rest on, or even reach, the argument that Schechtl made no effort to exclude Massachusetts purchasers from its American market. Cf. Ainsworth, 716 F.3d at 179.

over nearly two decades, and which initiated an ongoing relationship with its in-forum purchasers. Nicastro, by contrast, involved a manufacturer which lacked any similar ability to control the end location of its products, see 564 U.S. at 878 (plurality opinion) (noting that there was "no allegation that the distributor was under [the defendant's] control"), and which had no other relationship with the forum, see id. at 886. The defendant there knew only "that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states." Id. at 879 (internal quotation marks omitted). None of the opinions from Nicastro require that we accept Schechtl's arguments on appeal.

Schechtl's only remaining argument is that MetalForming takes title to the Schechtl products in Germany. First Circuit law has long found this argument irrelevant to the jurisdictional analysis. See Benitez-Allende v. Alcan Aluminio do Brasil, S.A., 857 F.2d 26, 30 (1st Cir. 1988) (Breyer, J.) ("The fact that title to the [products] passed in [a foreign country] is beside the point, for '[i]f International Shoe stands for anything, however, it is that a truly interstate business may not shield itself from suit by a careful but formalistic structuring of its business dealings.'" (quoting Vencedor Mfg. Co., Inc. v. Gougler Indus., Inc., 557 F.2d 886, 891 (1st Cir. 1977))). The same is true for an international business.

C.    Reasonableness

We explain briefly why we consider the exercise of jurisdiction to be reasonable under the five "gestalt" factors:

> (1) the defendant's burden of appearing [in the forum], (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 209 (1st Cir. 1994) (citing Burger King, 471 U.S. at 477).  Schechtl in its briefs, but not at oral argument, argues that Massachusetts litigation would be burdensome because it is a German company with German employees, and that cross-Atlantic travel and communications would impose burdens on its employees.  That there is some burden on Schechtl (which can be mitigated) is not enough on the facts here to make the exercise of jurisdiction unreasonable.  See Plixer, 905 F.3d at 13 (noting that "'[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant'" (quoting Asahi, 480 U.S. at 114 (opinion of O'Connor, J.)); see also C.W. Downer, 771 F.3d at 70 (noting that many of the case's logistical challenges "can be resolved through the use of affidavits and video devices").

III.

We conclude that the exercise of personal jurisdiction over Schechtl comports with due process. We reverse and remand for further proceedings consistent with this opinion.