# United States Court of Appeals
## For the First Circuit

No. 20-1936

DR. JUAN M. RODRIGUEZ-RIVERA, d/b/a "Centro Reumatologico Dr.
Juan Rodriguez",

Plaintiff, Appellant,

v.

ALLSCRIPTS HEALTHCARE SOLUTIONS, INC.; ALLSCRIPTS HEALTHCARE,
LLC,

Defendants, Appellees,

HEALTHCARE DATA SOLUTIONS, LLC, a/k/a HDSOSF, LLC; INSURANCE
COMPANIES A, B, and C; JOHN DOE; RICHARD ROE,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Thompson, Lipez, and Gelpí,
Circuit Judges.

José Luis Ubarri-García, with whom Francisco L. Charles-Gómez, Charles Gómez Law Office, LLC, Jorge Luis Guerrero-Calderón, Ubarri & Román Law Office, and Melvin Rosario-Rodríguez, were on brief, for appellant.

Salvador J. Antonetti-Stutts, with whom Mark L. Durbin, Scott T. Peloza, Barnes & Thornburg LLP, Alfredo Ramírez-Macdonald, Aura A. Montes-Rodríguez, Ricardo J. Casellas, and O'Neill & Borges

LLC, were on brief, for appellees.

July 19, 2022

**THOMPSON, Circuit Judge**.    After electronic patient records from his medical practice were destroyed, Dr. Juan M. Rodríguez-Rivera ("Rodríguez") says he was left with substantial damages to both himself and his practice.    So he sued (among others) Allscripts Healthcare Solutions, Inc. ("AHS") and Allscripts Healthcare, LLC ("Allscripts") in Puerto Rico federal court, bringing a whole host of claims.    In response, AHS and Allscripts moved to dismiss, claiming the Puerto Rico court lacked personal jurisdiction over them, pushing for the dispute to be arbitrated based on a supposed agreement Rodríguez made to do so, and contending that Rodríguez's complaint failed to state a claim on the merits.    The district court agreed on all points, dismissing the case in its entirety, with prejudice.    We have a different take on most of this.    So, as we'll soon explain, we affirm (with modification) the dismissal of AHS on personal-jurisdiction grounds but vacate and remand for further proceedings as to Allscripts.

## I.    The Backdrop

We begin by setting the stage.    Rodríguez is a licensed physician in Puerto Rico specializing in rheumatology.[1]    As a physician, he has to keep medical records.    Around 2009, in order

---

[1] His practice goes by the name Centro Reumatológico de Bayamón Dr. Juan M. Rodríguez, but we use Rodríguez to encompass both the person and the practice.

to comply with patient data security rules out of the Health Insurance Portability and Accountability Act of 1996 (which we know as HIPAA), Pub. L. No. 104-191, 110 Stat. 1936, Rodríguez purchased the product MyWay to store, manage, and protect the electronic medical records of his patients. That electronic version of a patient's medical record is called an Electronic Health Record, or "EHR" for short. Usually, those EHRs are held on the technology provider's -- not the physician's -- electronic servers.

Enter stage the defendants Allscripts and AHS. Allscripts is a North Carolina limited liability company with its principal place of business in Chicago. Allscripts is indirectly owned by AHS, a holding company which itself is a Delaware corporation also with its principal offices in Chicago (though AHS itself does not manufacture, market, or sell any goods or services). Allscripts provides, among other things, practice management and EHR technology to healthcare providers. Allscripts' MyWay product is an EHR- and practice-management software designed to help physicians' practices. Allscripts' MyWay EHRs are stored on a server owned by Allscripts.

Rodríguez was introduced to Allscripts' MyWay software through NovatekPR, an authorized third-party reseller. After setting things up in 2009, Rodríguez's patients' EHRs were stored with Allscripts' MyWay service uneventfully for several years.

That began to change in 2016.  In September of that year, Allscripts informed Rodríguez by email that it was discontinuing support for MyWay and would soon be providing support exclusively for its new system, Professional EHR, effective at the end of October 2017.  Not wishing to join Allscripts' new product, Rodríguez decided to migrate his patients' EHRs to Aprima, a competitor of Allscripts.  In early February 2017, in response to an inquiry from Aprima regarding the necessary steps to accomplish Rodríguez's EHR data migration, Allscripts informed Aprima that it was unable to provide Rodríguez's EHR data.  Days later, Allscripts emailed Rodríguez informing him that "Allscripts no longer has your patient data.  It was destroyed because we no longer had an existing [Business Associates Agreement] with your practice.  Your practice was a subaccount of Novatek, a MyWay partner. . . .  The Novatek account was sent to collections in 2014 and for whom maintenance was terminated."

Distraught over his now-missing EHRs, Rodríguez filed the instant suit against AHS and Healthcare Data Solutions, LLC (as well as unnamed insurance companies) alleging negligence, gross negligence and liabilities, and mail and wire fraud. Rodríguez amended his complaint three times, with his third amended complaint adding Allscripts as a defendant and alleging eight

counts:  breach of contract, negligence, dolo[2], fraud, mail and wire fraud, breach of implied warranty, unjust enrichment, and temerity.

Allscripts and AHS initially moved to dismiss for lack of personal jurisdiction and failure to state a claim, but the district court denied that motion without prejudice pending the outcome of jurisdictional discovery that it ordered.  The court ordered Rodríguez to produce his contract with Novatek for the purchase and use of MyWay, as counsel for Rodríguez had previously indicated that the document was in counsel's possession.  In response, Rodríguez submitted an unsworn statement by Novatek's former president, Luis Carmoega, who declared that the contract was lost or destroyed during Hurricane Maria.  The court found that the proper remedy for the discovery-production controversy was for AHS and Allscripts to depose Carmoega.  And at deposition, Carmoega repeated his earlier statement:  He did not have any copy of the contract.

---

[2] A creature of Puerto Rico contract law, dolo constitutes "deceit when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them he would not have made."  Feliciano-Muñoz v. Rebarber-Ocasio, 970 F.3d 53, 62 (1st Cir. 2020) (quoting P.R. Laws Ann. tit. 31, § 3408).  Dolo is a specific type of fraud "that affects a contracting party."  Portugues-Santana v. Rekomdiv Int'l, 657 F.3d 56, 60 (1st Cir. 2011); see also Est. of Berganzo-Colon ex rel. Berganzo v. Ambush, 704 F.3d 33, 39 (1st Cir. 2013) (setting forth dolo elements).

In response, AHS and Allscripts produced an End User License Agreement ("EULA")[3] that provided the terms and conditions of the use of the MyWay software.  The EULA contained an arbitration clause requiring any claim arising out of the contract to be settled by binding arbitration held in Raleigh, North Carolina and applying North Carolina law.  Carmoega confirmed that his initials appear on each page of the EULA, which is dated December 2008.  He testified that it was standard practice to make sure his clients agreed to the EULA and thus Rodríguez "must have" signed the EULA.  But, Carmoega said, he did not have a copy of Rodríguez's signed EULA from the sale in 2009.

After that revelation, AHS and Allscripts filed renewed motions to dismiss Rodríguez's complaint for:  (1) lack of personal jurisdiction;  (2)  improper  venue  (citing  the  arbitration agreement); and (3) failure to state a claim upon which relief can be granted.  The district court granted the motion, finding the disputes  should  be  arbitrated,  that  it  lacked  personal jurisdiction over both Allscripts and AHS, and that Rodríguez's

---

[3] An EULA, also sometimes called a "Terms of Use" policy, is a type of contract that has become "a standard practice for producers of digital goods to include" with their products.  Erik Bauman, Note, The Nexus Analysis:  License Enforcement in the Wake of MDY v. Blizzard, 27 Berkeley Tech. L.J. 503, 503, 507 (2012). Generally, EULAs "lay[] out the terms and conditions of the license," defining certain items such as the copies a user can make, transfer rights, restrictions on use of the software, and other obligations of the parties (i.e., the end user and the software's creator or owner).  Id.

complaint failed as a matter of law.  Rodríguez's timely appeal followed, and that's where our work comes in.

## II.  Personal Jurisdiction

We begin with the district court's conclusion that it lacked personal jurisdiction over both Allscripts and AHS.

In reaching its jurisdictional determination, the district court employed the prima facie method -- meaning the district court did not hold an evidentiary hearing and instead considered only "whether [Rodríguez] has proffered evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." Phillips v. Prairie Eye Ctr., 530 F.3d 22, 26 (1st Cir. 2008).  Under the prima facie approach, typically used at the early stages of litigation, "'the district court acts not as a factfinder, but as a data collector.'" Chen v. U.S. Sports Acad., Inc., 956 F.3d 45, 51 (1st Cir. 2020) (internal citation omitted) (quoting Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145 (1st Cir. 1995)).  Where, as here, a district court dismisses a case for lack of personal jurisdiction based on the prima facie record, our review is de novo.  Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34 (1st Cir. 2016).  In conducting this de novo review, we draw the relevant facts "from the pleadings and whatever supplemental filings (such as affidavits) are contained in the

record, giving credence to the plaintiff's version of genuinely contested facts."  Id.

"In determining whether a non-resident defendant is subject to its jurisdiction, a federal court exercising diversity jurisdiction," like we do here, "'is the functional equivalent of a state court sitting in the forum state.'"  Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995) (quoting Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 204 (1st Cir. 1994)).  Therefore, to establish personal jurisdiction over AHS and Allscripts, Rodríguez must meet the requirements of both the Puerto Rico long-arm statute and the Due Process clause of the Fourteenth Amendment.  Negrón-Torres v. Verizon Commc'ns, Inc., 478 F.3d 19, 24 (1st Cir. 2007). Because Puerto Rico's long-arm statute is coextensive with the outer limits of the Constitution, we march directly to the constitutional inquiry.  Id.

Under the Due Process clause, a nonresident defendant may be subjected to jurisdiction within a forum only if she has "certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  Int'l Shoe Co. v. Wash. Off. Unemployment Comp. & Placement, 326 U.S. 310, 316 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)).  For specific personal jurisdiction, the constitutional analysis has three distinct prongs:  (1) relatedness; (2) purposeful availment; and (3)

- 9 -

reasonableness. Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 60 (1st Cir. 2002).[4] We take each in turn, keeping in mind that Rodríguez bears the burden of demonstrating that all three prongs are satisfied here. A Corp. v. All Am. Plumbing, Inc., 812 F.3d 54, 59 (1st Cir. 2016).

### 1. Relatedness

To satisfy the relatedness prong, Rodríguez must show a nexus between his claim and the defendants' forum-based activities. Id. That means that "[t]he plaintiff's claims . . . 'must arise out of or relate to the defendant's contacts' with the forum." Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1025 (2021) (quoting Bristol-Myers Squibb Co. v. Superior Ct., 137 S. Ct. 1773, 1780 (2017)).

AHS. First in line is the relatedness of this suit to AHS's Puerto Rico contacts. As we flagged earlier, AHS is a holding company and an indirect parent of Allscripts. But AHS itself does not manufacture, market, or sell any goods or services. Nor, we add, does AHS apparently have any contacts with Puerto Rico. Below, one of AHS's employees declared that AHS has never had any offices, real property, employees, officers, or bank

---

[4] Because Rodríguez trains his appellate arguments only on whether there was specific personal jurisdiction, we do not consider any potential general-personal-jurisdiction arguments. See Rodríguez v. Mun. of San Juan, 659 F.3d 168, 175 (1st Cir. 2011) (claims not made are waived).

accounts in Puerto Rico, nor has it ever been licensed to do business there.

Although Rodríguez does not dispute any of these facts, he nonetheless fails to acknowledge any distinction between AHS and Allscripts in his jurisdictional arguments.[5] Yet, generally, the jurisdictional contacts of a subsidiary corporation are not imputed to its parent. De Castro v. Sanifill, Inc., 198 F.3d 282, 283-84 (1st Cir. 1999). "The mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is the sole owner of the subsidiary." Escude Cruz v. Ortho Pharm. Corp., 619 F.2d 902, 905 (1st Cir. 1980). To establish jurisdiction over a parent company, under Puerto Rico law, a plaintiff "must produce 'strong and robust' evidence of control by the parent company over the subsidiary, rendering the latter a 'mere shell.'" De Castro, 198 F.3d at 283-84 (quoting Escude Cruz, 619 F.2d at 905); see also Speedway Motorsports Int'l Ltd. v. Bronwen Energy Trading, Ltd.,

---

[5] Rodríguez argues that it is "mind-boggling" to say that he doesn't make a proper distinction and separate jurisdictional analysis regarding each defendant, yet the defendants' counsel referred to "Allscripts" as one single monolithic entity (including both Allscripts and AHS) before the district court. It is true that defendants' counsel often did this, but counsel also made clear that they are two separate entities, and several affidavits from AHS and Allscripts employees confirmed this. Furthermore, Rodríguez's own complaint acknowledges that AHS and Allscripts are two separate companies. Confronted with the fact that AHS is a mere holding company, Rodríguez still fails to present a separate jurisdictional argument as to AHS.

- 11 -

707 S.E.2d 385, 396 (N.C. Ct. App. 2011) (holding under North Carolina law (the law of the state where Allscripts is organized) that the activities of corporate relatives cannot be imputed to each other "for purposes of personal jurisdiction without proof that [they] are part of the same whole and were not acting independently").[6]  And AHS's declarant says that AHS does <u>not</u> control or direct the activities of Allscripts -- and, again, Rodríguez does not dispute that fact.[7]

In the end, it was Rodríguez's burden to present evidence demonstrating that the district court could exercise personal jurisdiction over AHS.  His bundled arguments and evidence are insufficient to show a sufficient nexus in this case between his claims and AHS's forum contacts (or lack thereof).  See <u>United States</u> v. <u>Swiss Am. Bank, Ltd.</u>, 274 F.3d 610, 621 (1st Cir. 2001) (noting that "there can be no requisite nexus between the contacts and the cause of action if no contacts exist").  Rodríguez having

---

[6] The parties do not clarify what law applies to a potential veil-piercing theory, but we need not decide which law applies given that Rodríguez fails to meet his burden under either law we see as potentially applicable.

[7] Rodríguez briefly points to a hearing on the motion to dismiss in which AHS and Allscripts' counsel stated that Allscripts is the parent of AHS.  He thus says this contradiction raises a factual issue regarding whether one or both of these companies had his EHRs under their custody and control.  Yet the documentary evidence is clear that this was merely a slip of tongue, not the sort of "genuinely contested facts" we give credence to the plaintiff's view on.  See <u>Baskin-Robbins Franchising LLC</u>, 825 F.3d at 34.

failed to satisfy this first prong of the due-process inquiry, and without any evidence of control of Allscripts by AHS, the district court properly granted the motion to dismiss for lack of personal jurisdiction with respect to AHS. See id. at 625 (failure to show relatedness ends the inquiry). Although the district court dismissed the complaint with prejudice, we will modify the judgment to state that dismissal of AHS is without prejudice. See 28 U.S.C. § 2106; Claudio-de León v. Sistema Universitario Ana G. Méndez, 775 F.3d 41, 50 (1st Cir. 2014). That's so because a dismissal on jurisdictional grounds, as opposed to a merits dismissal, should ordinarily be made without prejudice. See N. Am. Cath. Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 13 (1st Cir. 2009); see also Fed. R. Civ. P. 41(b) (noting that dismissal for lack of jurisdiction is not an "adjudication on the merits"); Rodi v. S. New England Sch. of L., 389 F.3d 5, 18 (1st Cir. 2004) ("A dismissal for lack of personal jurisdiction is the paradigmatic example of a decision not on the merits.").[8]

Allscripts. Next up, we ask whether Rodríguez's claim is related to Allscripts' Puerto Rico contacts. And the answer is

---

[8] While the district court's dismissal did reach the merits of Rodríguez's claims, "a federal court generally may not rule on the merits of a case without first determining that it has jurisdiction over the category of claim in suit (subject-matter jurisdiction) and the parties (personal jurisdiction)." Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 430-31 (2007) (citing Steel Co. v. Citizens for Better Env't, 523 U.S. 83, 93-102 (1998)).

an easy yes.  The relatedness test is a relatively "flexible, relaxed standard."  Pritzker v. Yari, 42 F.3d 53, 61 (1st Cir. 1994).  It is simply meant to "ensure[] fundamental fairness by protecting a defendant from being hauled into an out-of-state forum based on a single contact with that forum that is wholly unrelated to the suit at issue."  Swiss Am. Bank, 274 F.3d at 623.

Here, Allscripts contracted with a Puerto Rico company to sell its product and sent its employee Chad Novitski to Puerto Rico several times to facilitate the business relationship between Allscripts and Novatek.  And with that relationship with Novatek, Allscripts clearly intended to tap into the Puerto Rico market to sell its product.  Through its relationship, Allscripts was fully aware that Puerto Rico residents, including Rodríguez, were using its MyWay product to store and manage EHRs -- in fact, it approved Rodríguez's contract and set up training for Rodríguez directly. See Knox v. MetalForming, Inc., 914 F.3d 685, 690–91 (1st Cir. 2019) (concluding the relatedness prong was "easily met" where the non-U.S. defendant sold its products in Massachusetts only through a third-party distributor and the plaintiff was injured there). And all that shows a demonstrable nexus between Allscripts' contacts with Puerto Rico and the destruction of Rodríguez's EHRs.[9]

---

[9] Rodríguez attempts to further bolster his argument on the relatedness prong by pointing to the in-forum "effects" theory presented first in Calder v. Jones, 465 U.S. 783 (1984).  In that case, there were no physical, mail, or telephone contacts between

- 14 -

### 2. Purposeful Availment

Next, Rodríguez must show that Allscripts purposefully availed itself of the privilege of conducting activities within Puerto Rico, thus invoking the benefits and protections of Puerto Rico's laws. See Bluetarp Fin., Inc. v. Matrix Constr. Co., 709 F.3d 72, 82 (1st Cir. 2013). Purposeful availment reflects a "rough quid pro quo," id. (quoting Carreras v. PMG Collins, LLC, 660 F.3d 549, 555 (1st Cir. 2011)) -- "[w]hen (but only when) a company exercises the privilege of conducting activities within a state -- thus enjoying the benefits and protection of its laws -- the State may hold the company to account for related misconduct," Ford Motor, 141 S. Ct. at 1025 (cleaned up) (quoting Int'l Shoe, 326 U.S. at 319). The purposeful-availment inquiry is intended "to assure that personal jurisdiction is not premised solely upon a defendant's 'random, isolated, or fortuitous' contacts with the forum state." Sawtelle, 70 F.3d at 1391 (quoting Keeton v. Hustler Mag., Inc., 465 U.S. 770, 774 (1984)). So, we focus "on the defendant's intentions, and the cornerstones are voluntariness and

_____

the defendants and the forum, but the Supreme Court held that the forum could assert personal jurisdiction over the defendants based on the "effects" of their out-of-forum conduct in the forum. Id. at 789. But we have recognized that Calder's "effects" theory was adopted "for determining *purposeful availment* in the context of defamation cases." Noonan v. Winston Co., 135 F.3d 85, 90 (1st Cir. 1998) (emphasis added); see Swiss Am. Bank, 274 F.3d at 623 (noting that Calder's effects test "is a gauge for purposeful availment and is to be applied only after the relatedness prong has already been satisfied").

foreseeability." Bluetarp Fin., 709 F.3d at 82 (citation omitted). Voluntariness asks whether the defendant's contacts with the forum state are of its own making and "not based on the unilateral actions of another party or a third person." Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 716 (1st Cir. 1996). And foreseeability asks whether the defendant's voluntary conduct and connection with the forum state are "such that [the defendant] should reasonably anticipate being haled into court there." Id. In all, the contacts "must show that the defendant deliberately reached out beyond its home -- by, for example, exploiting a market in the forum State or entering a contractual relationship centered there." Ford Motor, 141 S. Ct. at 1025 (cleaned up) (quoting Walden v. Fiore, 571 U.S. 277, 285 (2014)).

In addition to a defendant's specific attempts to target the forum state, see Plixer Int'l, Inc. v. Scrutinizer GmbH, 905 F.3d 1, 9 (1st Cir. 2018), a defendant's "'regular flow or regular course of sales' in the [forum]" can demonstrate purposeful availment, too, id. at 10. Although the mere placement of a product into the stream of commerce with the awareness that it could end up in a forum state, without more, is not enough to show purposeful availment, "[a]dditional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State." Asahi Metal Indus. Co. v. Superior Ct., 480 U.S. 102, 112 (1987) (opinion of O'Connor, J.); see Daimler AG v. Bauman, 571

- 16 -

U.S. 117, 135 n.13 (2014) (citing favorably the <u>Asahi</u> plurality's conclusion that a "defendant's act of marketing a product through a distributor who has agreed to serve as the sales agent in the forum State may amount to purposeful availment" (cleaned up) (quoting <u>Asahi</u>, 480 U.S. at 112 (opinion of O'Connor, J.))); <u>Knox</u>, 914 F.3d at 691-92.

Rodríguez argues that Allscripts purposefully availed itself of the privilege of doing business in Puerto Rico by contracting with Novatek, which Allscripts knew was going to sell MyWay to Puerto Rico residents, and its resulting sales to Puerto Rico residents. Rejoining, Allscripts contends that it did not directly target Puerto Rican residents; it was Novatek that promoted MyWay and contracted with physicians in Puerto Rico, and it was Novatek that Rodríguez contracted with to purchase MyWay.

Of course, the exercise of specific jurisdiction must rest on Allscripts' voluntary contact with Puerto Rico and not on "the 'unilateral activity of another party or a third person.'" <u>Burger King Corp.</u> v. <u>Rudzewicz</u>, 471 U.S. 462, 475 (1985) (quoting <u>Helicopteros Nacionales de Colombia, S.A.</u> v. <u>Hall</u>, 466 U.S. 408, 417 (1984)). But contrary to Allscripts' view, Rodríguez's argument for jurisdiction does not rest on Novatek's Puerto Rico activities. Rather, jurisdiction rests on the totality of Allscripts' voluntary activities that connect it to Puerto Rico.

Take for starters the revenue Allscripts generated from customers in Puerto Rico, which Allscripts plays down as "minimal." Allscripts entered into an agreement with a "Contract Value" of $478,800 with a Puerto Rico company to resell its MyWay product to physicians in Puerto Rico. From 2014 through 2017, Allscripts received $125,544 in revenue from Puerto Rico. Novatek alone had sold about five accounts in Puerto Rico, and we know that Allscripts had other users based in Puerto Rico aside from those five customers. And the payments made by physicians such as Rodríguez for the use of MyWay (which, at least for Rodríguez, were monthly) were sent by Novatek to Allscripts in the United States.[10] That revenue is not far off from Plixer's $200,000 forum-originated revenue that we called "not insubstantial" and led us to conclude that the defendant there could have reasonably anticipated being hauled into court in the forum.[11] See 905 F.3d at 4-5, 10. And it is far more than "a single isolated sale" into

---

[10] Allscripts argues that there is nothing in the record to support the contention that payments from Puerto Rico physicians for the use of MyWay were sent by Novatek to Allscripts, but Carmoega's declaration makes this clear as day.

[11] Allscripts points out that its revenue from Puerto Rico during the relevant time period made up only 0.0025% of the company's total revenue. But we upheld the exercise of personal jurisdiction in Plixer even though the record did not reveal what percentage of the defendant's total revenue came from the forum, see 905 F.3d at 4-5, 10, instead finding the "not insubstantial income from th[e U.S.] market" showed that it could've reasonably anticipated being haled into court there, id. at 10.

the forum, which is insufficient to support an assertion of jurisdiction. J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 888 (2011) (Breyer, J., concurring).[12]  But we don't have just that (and thus need not decide whether those sales alone would be enough) -- there's more.

We also know that Allscripts, in engaging Novatek as a third-party reseller of its MyWay product, did much more than merely throw its product into the stream of commerce -- it deliberately and specifically targeted Puerto Rico. See Daimler, 571 U.S. at 136 n.13 ("[A] corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there."); Benitez-Allende v. Alcan Aluminio Do Brasil, S.A., 857 F.2d 26, 30 (1st Cir. 1988) (Breyer, J.) (deliberate efforts to market in Puerto Rico can constitute purposeful availment).  Indeed, Novatek was no national distributor, compare Nicastro, 564 U.S. at 892 (Breyer, J., concurring) (questioning whether a defendant's use of a nationwide distributor would always mean that it was subject to jurisdiction in any state), with Knox, 914 F.3d at 692 ("[T]he use of a nationwide distributor does not automatically preclude the exercise of jurisdiction."), but rather was a distributor only in the Puerto Rico market.  Through its

_____

[12] "[W]e have held that the narrowest, and thus binding, opinion from the 'fragmented Court' in [Nicastro] was Justice Breyer's."  Knox, 914 F.3d at 691 (quoting Plixer, 905 F.3d at 10).

- 19 -

relationship with Novatek, Allscripts promoted MyWay in various publications in Puerto Rico.[13]  See Asahi Metals, 480 U.S. at 112 (Opinion of O'Connor, J.) (noting that "marketing the product through a distributor" in the forum state may amount to purposeful availment); see also Knox, 914 F.3d at 692.  And, to boot, Novatek wasn't the only distributor Allscripts had pushing MyWay down in Puerto Rico at the time; Allscripts had another distributor in Puerto Rico competing with Novatek.

Then we have Allscripts' efforts to continue its relationship with Puerto Rico purchasers once they were in the door.  It wasn't just lining up distributors to land new customers for Allscripts -- Allscripts also established and maintained relationships with purchasers, deliberately opening channels of communication to its Puerto Rico customers.  See Knox, 914 F.3d at 693 (considering the fact that the defendant opened channels of communication with customers in the forum); see also Asahi, 480 U.S. at 112 (opinion of O'Connor, J.) (suggesting such channels can support finding purposeful availment).  Allscripts provided customer-service support to Rodríguez, a Puerto Rico customer, directly.  See Asahi, 480 U.S. at 112 (opinion of O'Connor, J.).

---

[13] Indeed, as part of the agreement between Novatek and Allscripts, Allscripts agreed to "provide support" to Novatek in order "[t]o assist [Novatek] in its sales and marketing efforts" and provided Novatek with "appropriate sales training" concerning the software.  Allscripts also controlled what marketing materials Novatek could use.

Indeed, Allscripts communicated to Novatek that Rodríguez specifically (identifying him by his client-account number) needed to take some initial training courses prior to beginning use of its MyWay product, and followed up with Rodríguez directly on the same training.  And Allscripts sent a letter directly to Rodríguez (in Puerto Rico) soliciting him to upgrade to its new software after they discontinued MyWay, imploring Rodríguez to contact Allscripts directly.

Moreover, even if we toss aside the fact that Allscripts picked a specific distributor to target Puerto Rico and tried to directly build relationships with purchasers in Puerto Rico once its independent distributors got Puerto Rico customers in the door, this is still not a typical stream-of-commerce case.  Yet again, we have more.  As we've explained, "[c]ases including a standard stream-of-commerce analysis usually involve entities who cannot necessarily predict or control where downstream their products will land; intervening actors like distributors may take the products to unforeseeable markets." Plixer, 905 F.3d at 8.  Unlike that typical mold, Allscripts' product here went "only to the customers that [Allscripts] accepted." Id.; see Knox, 914 F.3d at 693 (considering that the defendant "individually approved" forum-based purchasers).  All sales contracts executed between Novatek and its Puerto Rico physician-clients for the use of MyWay had to be authorized by Allscripts' officers in the United States.  In

fact, after authorization, Allscripts would send the client their signed copy of the contract. This gives us "an objectively clearer picture" of Allscripts' intent to serve Puerto Rico, "the crux of the purposeful availment inquiry." Plixer, 905 F.3d at 8.

So it's clear Allscripts' Puerto Rico-based revenue and MyWay users were not a product of mere happenstance of a modern stream of commerce -- it was the product of Allscripts' deliberate attempts to tap the Puerto Rico market to sell its product and reap the financial benefits. After several years of knowingly targeting new Puerto Rico customers, serving current Puerto Rico customers, and benefitting from not insubstantial revenue out of Puerto Rico, Allscripts cannot claim that its contact with Puerto Rico was involuntary or that it couldn't foresee being haled into a Puerto Rico courtroom when things went south with those customers.

### 3. Reasonableness

Last up in the personal-jurisdiction analysis is reasonableness. To assess reasonableness, we consider the five so-called "gestalt" factors: (1) Allscripts' burden of appearing in Puerto Rico; (2) Puerto Rico's interest in adjudicating the dispute; (3) Rodríguez's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social

policies. Knox, 914 F.3d at 694; see Burger King, 471 U.S. at 477. These factors are intended "to aid the court in achieving substantial justice, particularly where the minimum contacts question is very close." Nowak, 94 F.3d at 717; see Ticketmaster, 26 F.3d at 210 ("[T]he reasonableness prong of the due process inquiry evokes a sliding scale: the weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction."). As we've said before, "[t]he gestalt factors rarely seem to preclude jurisdiction where relevant minimum contacts exist." Cambridge Literary Props. v. W. Goebel Porzellanfabrik G.m.b.H & Co. Kg., 295 F.3d 59, 66 (1st Cir. 2002). And this is not one of those few-and-far-between cases.

We consider first the burden on Allscripts of litigating in Puerto Rico. We have recognized that it is "almost always inconvenient and costly for a party to litigate in a foreign jurisdiction," but for this factor to have any significance, a defendant "must demonstrate that 'exercise of jurisdiction in the present circumstances is onerous in a special, unusual, or other constitutionally significant way.'" Nowak, 94 F.3d at 718 (quoting Pritzker, 42 F.3d at 64). Allscripts alleges nothing special or unusual about its situation; indeed, it does not even argue that it would be burdened by litigating in Puerto Rico. See, e.g.,

Pritzker, 42 F.3d at 64 (noting that traveling to Puerto Rico isn't overly burdensome in the modern era).

On the second factor, we cannot discount Puerto Rico's strong interest in this dispute, given that it involves the loss of medical records belonging to Puerto Rico residents who were receiving medical treatment in Puerto Rico by a physician licensed under the laws of Puerto Rico. See Ticketmaster, 26 F.3d at 211 ("The forum state has a demonstrable interest in exercising jurisdiction over one who causes tortious injury within its borders."); see also Burger King, 471 U.S. at 473 ("[A] State generally has a 'manifest interest' in providing its resident with a convenient forum for redressing injuries inflicted by out-of-state actors." (citation omitted)). And Allscripts again does not dispute Puerto Rico's interest in the matter.

As to Rodríguez's convenience, a plaintiff's choice of forum must be accorded deference, Foster-Miller, 46 F.3d at 151, and Allscripts does not suggest that a Puerto Rico forum wouldn't be more convenient for Rodríguez.

As to the most effective resolution of the controversy, Rodríguez argues that this factor weighs in his favor because in North Carolina he would be remediless, but he does not explain why. Allscripts argues, without supporting authority, that the FAA's and North Carolina's favoritism toward arbitration must be

considered.[14]  Without more, this factor does not appear to cut in either direction.

And to the final factor, the "common interests of all sovereigns in promoting substantive social policies," Rodríguez contends that Puerto Rico has an interest in protecting its citizens from out-of-state providers of services that cause harm, and to provide its citizens with a forum to seek redress. Allscripts again has no rejoinder.  And we agree with Rodríguez and note that "[t]his policy assumes added importance in our age of advanced telecommunications, which has so facilitated the representation of geographically distant clients." Sawtelle, 70 F.3d at 1395.

On balance, the gestalt factors demonstrate the reasonableness of a Puerto Rico forum.  Considered in combination with Rodríguez's more than adequate showing on the first two prongs of the constitutional test, a Puerto Rico court's exercise of jurisdiction over Allscripts does not offend notions of fair play and substantial justice.  The district court therefore improperly granted the motion to dismiss for lack of personal jurisdiction with respect to Allscripts.

---

[14] As we'll get to shortly, that argument puts the cart before the horse, since Rodríguez disputes that any enforceable agreement to arbitrate exists here.

## III. Agreement to Arbitrate

Firm in our conclusion that the district court could have exercised personal jurisdiction over Allscripts, we turn to the next issue:  whether the suit should not have been brought in a federal court because Rodríguez and Allscripts had an agreement to arbitrate disputes like this one.

### A.    Legal Landscape

Under the Federal Arbitration Act ("FAA"), "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "With the [FAA], Congress set a 'liberal federal policy favoring arbitration.'"  Rivera-Colón v. AT&T Mobility P.R., Inc., 913 F.3d 200, 207 (1st Cir. 2019) (quoting AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 346 (2011)).  As part of that liberal policy, the FAA puts arbitration agreements "on equal footing with all other contracts," Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 443 (2006), meaning that courts must treat arbitration as "a matter of contract" and enforce agreements to arbitrate "according to their terms," Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019).  Thus, when a party agrees to arbitrate a dispute, the FAA leaves federal courts powerless to

address the merits of that dispute. Instead, we must send the parties off, as they agreed, to duke out their dispute in their arbitral forum. Rivera-Colón, 913 F.3d at 208.

But as a consequence of its contract-based philosophy, the FAA's liberal policy favoring arbitration "is only triggered when the parties actually agreed to arbitrate." Id. at 207. So first, to trigger the FAA's protective reach, the existence of a valid and enforceable agreement to arbitrate between the parties must be identified. Nat'l Fed'n of the Blind v. The Container Store, Inc., 904 F.3d 70, 80 (1st Cir. 2018). And the party seeking to compel arbitration (here, that's Allscripts) bears the burden of demonstrating that a valid agreement to arbitrate exists. Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011).

Below, Allscripts styled the portion of its motion to dismiss invoking the arbitration clause as an argument for improper venue. Following that improper-venue lead, the district court granted Allscripts' motion applying the standard under Federal Rule of Civil Procedure 12(b)(3). But we "treat a motion to dismiss based on an arbitration clause as a request to compel arbitration when the facts of the case make it clear that the party intended to invoke arbitration." Soto v. State Indus. Prods., Inc., 642 F.3d 67, 70 n.1 (1st Cir. 2011); see also Air-Con, Inc. v. Daikin Applied Latin Am., LLC, 21 F.4th 168, 172 n.5 (1st Cir.

2021).  And that's clearly what Allscripts did here, since its motion papers below cited the FAA and FAA caselaw.

The FAA (and specifically section 4) instructs courts determining whether to compel arbitration to "hear the parties," which "appears to contemplate the submission and consideration of evidentiary materials -- including materials beyond those attached to the pleadings -- in support of and opposition to a motion to compel arbitration under the FAA."  Air-Con, 21 F.4th at 175; see 9 U.S.C. § 4.  As we recently held (though after the district court issued its ruling here), section 4 thus commands that district courts ordinarily apply the summary-judgment standard -- not the motion-to-dismiss standard -- to evaluate motions to compel arbitration.[15]  Air-Con, 21 F.4th at 175.  As we explained, the summary-judgment standard, which evaluates the evidentiary supportability of claims, better aligns with the FAA's command to evaluate whether the moving party has met its burden of demonstrating that an agreement to arbitrate is not "in issue" than Federal Rule of Civil Procedure 12's plausibility standard,

---

[15] To be sure, we carved out the possibility in Air-Con that there could be exceptional cases where the parties have foregone the submission of record materials and have relied solely on the pleadings to support or oppose the motion.  21 F.4th at 177 n.10.  In those circumstances, the district court should evaluate the motion to compel arbitration under the Rule 12(b)(6) standard. Id.

which is limited to a facial analysis of the pleadings.  See id. at 174.[16]

Under the summary-judgment standard, the record must be construed in the light most favorable to the non-moving party, with all reasonable inferences drawn in its favor.  Id. at 175; Taite v. Bridgewater State Univ., Bd. of Trs., 999 F.3d 86, 92 (1st Cir. 2021).  If the party opposing arbitration "puts forward materials that create a genuine issue of fact about a dispute's arbitrability, the district court 'shall proceed summarily' to trial to resolve that question."  Air-Con, 21 F.4th at 175 (footnote omitted) (quoting 9 U.S.C. § 4).  Because the district court should evaluate a motion to compel arbitration under the summary-judgment standard, we review its ruling de novo, see id. at 176; see also Taite, 999 F.3d at 92, as we would its ruling under a Rule 12(b)(6) standard, see Air-Con, 21 F.4th at 177 n.10; Zenon v. Guzman, 924 F.3d 611, 616 (1st Cir. 2019).[17]

---

[16] Allscripts contends that Rodríguez waived any ability to argue for a summary-judgment standard by failing to ask for it. But, just as in Air-Con, the errors the district court committed here hold true under either the motion-to-dismiss or summary-judgment standard.  See 21 F.4th at 173 n.6.  And, we also note, Rodríguez told the district court to apply the summary-judgment standard, since Allscripts had submitted a host of documents and testimony in support of its motion.  It was instead Allscripts that insisted a Rule 12(b) standard should apply.

[17] Allscripts posits that clear-error review applies to the district court's factual findings, citing a footnote of ours in Rivera-Colón.  913 F.3d at 206 n.6.  But Rivera-Colón doesn't say that a district court's resolution of factual issues in deciding a motion to compel arbitration on the motion papers and supporting

**B.    Analysis**

Against this backdrop, the parties argue primarily over the existence of an agreement to arbitrate, and the district court trained its analysis on this question, too.

According to Allscripts, Rodríguez agreed to the EULA when using the MyWay product, and that EULA contained a binding arbitration clause.  As a reminder, though, the EULA containing an arbitration clause that was allegedly signed by Rodríguez was not produced.  Allscripts did, however, produce an EULA containing an arbitration clause that was signed by Carmoega (the president of Novatek, which sold MyWay to Rodríguez) and suggested in its briefs that the EULA would have been the same.  And Allscripts pointed to Carmoega's deposition testimony that Rodríguez "must have" signed such an EULA.  Relying on Carmoega's testimony, the district court rejected Rodríguez's contention that there is no existing EULA

---

exhibits -- and applying a Rule 12(b) standard, as the district court did here -- is reviewed for clear error.  Rather, Rivera-Colón cites to a case discussing the standard of review after an evidentiary hearing -- not, as here, a ruling on a motion to dismiss.  Id. (citing Quint v. A.E. Staley Mfg. Co., 246 F.3d 11, 14 (1st Cir. 2001)); see Quint, 246 F.3d at 13; compare Air-Con, 21 F.4th at 177 n.10 (Rule 12(b)(6) standard requires resolving factual disputes in the non-movant's favor).  Below, Allscripts said the court should apply a Rule 12(b)(3) standard, citing to Seventh Circuit law.  And, even assuming we would adopt our sister circuit's reasoning, Seventh Circuit law makes clear that courts applying that standard must resolve factual disputes in the non-movant's favor, too.  See Jackson v. Payday Fin., LLC, 764 F.3d 765, 773 & n.19 (7th Cir. 2014) (and collecting cases); see also 5B Charles Alan Wright & Arthur B. Miller, Federal Practice & Procedure § 1352 (3d ed.).

- 30 -

signed by him that compels arbitration and found that Rodríguez did in fact agree to arbitrate this matter by (presumably) signing the EULA that Allscripts proffered. That EULA was signed by Carmoega (not Rodríguez) in December 2008 (about seven months before Rodríguez purchased the MyWay service).

In so ruling, we agree with Rodríguez that the district court erred -- and we highlight three errors we see.

First, the district court's conclusion that Rodríguez failed to rebut Carmoega's testimony that Rodríguez signed an EULA was based on a false premise of its own making. Rodríguez did, in fact, submit evidence rebutting that testimony: He filed an affidavit in conjunction with his opposition to the motion to dismiss stating (among other things) that he never agreed to an arbitration process. But, clearing the way for Allscripts, the district court struck the entire affidavit. The court reasoned that Rodríguez's affidavit failed the requirements of Rule 56(c)(4)[18] because it was a "combination of statements of which Dr. Rodríguez has no personal knowledge, hearsay statements, and conclusory statements without supporting evidence."

---

[18] Federal Rule of Civil Procedure 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

In our view, the district court abused its discretion in striking this affidavit. See Livick v. The Gillette Co., 524 F.3d 24, 28 (1st Cir. 2008) (abuse-of-discretion review applies). As we've explained before, district courts must apply Rule 56(c)(4) "to each segment of an affidavit, not to the affidavit as a whole," and approach the declaration with "a scalpel, not a butcher's knife," disregarding only those portions that are inadmissible and crediting the remaining statements. Perez v. Volvo Car Corp., 247 F.3d 303, 315 (1st Cir. 2001). Ignoring that warning and wielding a butcher's knife, the district court struck the entire affidavit but offered no reasoning on why certain aspects of the affidavit failed the rule's criteria. Indeed, Rodríguez's statement that he "never consented or agreed to submit [him]self to an arbitration process" is, quite clearly, made with his personal knowledge (and we don't see how it's hearsay or conclusory).[19] And once we plug that lone statement back in, Rodríguez certainly did submit evidence rebutting Allscripts' evidence that he signed the EULA they presented and thus agreed to arbitrate -- evidence that the

_____

[19] Below, Allscripts contended that this statement should be stricken because "the record demonstrates [that it is] plainly wrong," citing to Carmoega's deposition testimony to the contrary. And Allscripts strikes a similar tone on appeal, arguing that the district court properly found that Rodríguez "did not present any credible evidence." But Allscripts did not then, nor does it now, offer any legal support for the proposition that an affidavit may be stricken because it is "plainly wrong" and conflicts with another party's testimony.

district court had to read in the light most favorable to Rodríguez, whether under the motion-to-dismiss or summary-judgment standard. See Air-Con, 21 F.4th at 175, 177 & n.10.

Second, even if we were to accept the district court's view that the evidence was undisputed that Rodríguez signed an EULA, the district court erred in not holding Allscripts to its burden of demonstrating that Rodríguez agreed to arbitrate when he signed such an EULA. Again, the party seeking to compel arbitration bears the burden of demonstrating that the opposing party agreed to arbitrate the dispute. See Air-Con, 21 F.4th at 176; Rivera-Colón, 913 F.3d at 207. And although secondary evidence or business-routine evidence may sometimes be used to prove the agreement when the original is missing, see Paul Revere Variable Annuity Ins. Co. v. Zang, 248 F.3d 1, 9 (1st Cir. 2001); see also Fed. R. Evid. 406; id. R. 1004, Allscripts submitted no evidence that the EULA that Rodríguez may have signed was at all similar to the EULA it presented to the district court.

Throughout the litigation, Allscripts has simply taken Carmoega's testimony to mean that because Rodríguez must have signed an EULA, he must have signed this EULA. Yet Carmoega never testified that the terms of the EULA he reviewed at his deposition were identical to those in the EULA he believes he showed Rodríguez. Instead, he said only that the document titled "End User License Agreement" "is the End User License Agreement." But

that doesn't tell us that he reviewed all the terms of the multi-page document and thought they were all the same -- the record contains no evidence that anyone asked Carmoega anything about whether the EULA he saw at deposition contained the same terms as the one he would've shown Rodríguez in 2009. Indeed, Carmoega testified at other points that he could not recall the details of the various agreements he would have had Rodríguez sign. And Rodríguez disputed that the EULA produced by Allscripts in this litigation was the same he would have been shown by Carmoega. The district court failed to hold Allscripts to its burden when it leapfrogged over the fact that Allscripts failed to present any record evidence to meet its burden of showing that the EULA that Rodríguez "must have" signed contained any arbitration agreement. There was no testimony, nor any documentary evidence, that Allscripts used the same EULA in 2009 (when Rodríguez allegedly would have signed it) as it did in 2008 (when the version presented to the district court was signed).

And third, for similar reasons, the district court's use-is-consent conclusion was off-base. The district court thought that even if Rodríguez didn't sign the EULA, the evidence nonetheless showed that he would still be bound by its arbitration clause because the face of the EULA states that use of the MyWay software constitutes agreement to its terms. And to be sure, a party may be bound under Puerto Rico law by a contract they

nonetheless did not sign on a dotted line for. See Rivera-Colón, 913 F.3d at 209-14. But again, the district court had no evidence that the EULA Rodríguez was allegedly shown included any language letting him know that use of MyWay constituted acceptance of the EULA, or, again, any arbitration clause.

So, without the district court's misallocation of the burden of proof and alteration of the record against Rodríguez, there is no basis for concluding that Rodríguez agreed to an EULA that contained an agreement to arbitrate. Whether a contract containing an arbitration clause and signed by Rodríguez exists was a disputed factual matter and the district court thus should have "proceeded summarily to trial to resolve th[e] question." Air-Con, 21 F.4th at 175.[20] The district court improperly dismissed this case to send the parties to an arbitral forum, so we will vacate and remand for further proceedings.

## IV. Failure to State a Claim

We now turn to the final issue: the district court's conclusion that Rodríguez's complaint failed to state a claim against Allscripts. Now, the district court, as we noted,

---

[20] Rodríguez also avers that the arbitration clause is unenforceable as a matter of law. But he did not make this argument below, meaning it is forfeited and reviewed at most only for plain error, Zampierollo-Rheinfeldt v. Ingersoll-Rand de P.R., Inc., 999 F.3d 37, 47 (1st Cir. 2021) -- a demanding standard that Rodríguez does not attempt to meet, meaning he waived it, see Covidien LP v. Esch, 993 F.3d 45, 56 (1st Cir. 2021).

concluded that the parties agreed to arbitrate all those claims. But it nonetheless took up Allscripts' invitation to rule on the merits of the claims and dismiss Rodríguez's suit with prejudice.

We appreciate the district court's tendency to be thorough and cover all the bases. Nonetheless, we have made clear repeatedly that federal courts "compelling arbitration should decide only such issues as are essential to defining the nature of the forum in which a dispute will be decided." Cortés-Ramos v. Sony Corp. of Am., 836 F.3d 128, 129-30 (1st Cir. 2016) (quoting Thompson v. Irwin Home Equity Corp., 300 F.3d 88, 91 (1st Cir. 2002)) (a similar case where the district court also ruled on the merits after concluding the dispute was arbitrable); see Local 201, Int'l Union of Elec. v. Gen. Elec. Co., 262 F.2d 265, 268 (1st Cir. 1959) ("[W]e have tried to make clear that once the court has decided that the parties have agreed to leave the particular issue to arbitration, it should not stay its hand in order to examine whether the correct determination of the issue, on its merits, is clear under the terms of the agreement."). Our judicial superiors have made the same clear, too; as they've put it: "A court has 'no business weighing the merits of the grievance' because the 'agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious.'" Henry Schein, Inc., 139 S. Ct. at 529 (quoting AT&T Techs., Inc. v. Commc'ns Workers, 475 U.S. 643, 650 (1986)). And our sister

circuits have echoed a similar refrain. E.g., <u>Kilgore</u> v. <u>KeyBank, Nat'l Ass'n</u>, 718 F.3d 1052, 1057 (9th Cir. 2013) (en banc) ("Under the Federal Arbitration Act, if Defendants are correct [that arbitration should have been compelled], the district court should never have reached the merits of Plaintiffs' claims."); <u>City of Meridian</u> v. <u>Algernon Blair, Inc.</u>, 721 F.2d 525, 528 (5th Cir. 1983) ("The court's sole function [under the FAA] is to determine whether the claim is referable to arbitration. Once that determination is made, the court may not delve further into the dispute.").

So, after concluding that the parties were bound to arbitrate their dispute, the district court should not have commented on the merits. And since there remains an open question on the arbitration issue, we'll hold back any premature analysis of the merits, too. Instead, we will vacate the district court's ruling on the merits of Rodríguez's complaint. If the court or a jury ultimately concludes that Rodríguez did not agree to arbitrate his claims, then the district court can revisit the merits of Allscripts' Rule 12(b)(6) motion anew.

We will, however, add two notes before we close out. First, in the event the district court has the opportunity to revisit a Rule 12(b)(6) motion, we implore it to give more than a cursory analysis of the seven claims in the complaint. And we similarly suggest that the parties crystallize the claims and theories they are pursuing. Second, we have some doubt about

Allscripts' argument that the complaint's failure to specify between the two defendants should necessarily result in dismissal. Certain information, such as the structure and responsibility of each distinct entity, may often be unavailable to the plaintiff at this early stage of litigation. So we think the district court may "take to heart the Supreme Court's call to 'draw on our judicial experience and common sense' as we make a contextual judgment about the sufficiency of the pleadings." Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 16 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)); see also Zond, Inc. v. Fujitsu Semiconductor Ltd., 990 F. Supp. 2d 50, 53–54 (D. Mass. 2014).

## V.  Closing Out

For all the foregoing reasons, we **affirm** (with modification) the dismissal of AHS for lack of personal jurisdiction but **reverse** the dismissal of Allscripts for lack of personal jurisdiction.  We **vacate** the judgment in all other respects and remand for further proceedings consistent with this opinion.  The parties shall bear their own costs.